You're welcome. That brings us to the last argument of the morning in Appeal No. 242488. Caroline, is it Matthiscyk? I said Mathiscyk, Your Honor. Mathiscyk. Okay, I'll go with your, which is the Commissioner of Social Security. Mr. Tarlac, nice to see you. Nice to see you, Your Honors. Good morning. May it please the Court, Robert Tarlac on behalf of Caroline Mathiscyk. Good morning to my esteemed colleague as well. Your Honors, I think there are two untraditional harms in this case and one traditional one. I'm going to start with the two untraditional ones. The first untraditional harm is that a medical expert was called in this case and the medical expert said that in their years of testifying, they'd never been in this position before where they couldn't actually give the judge a particular listing or, in their words, a particular parameter within the Social Security Act to fit this person but they were clear on their opinion that this person was disabled and either met or equaled the listing. And they spoke to the time involved in treatment specifically. And when the judge pushed the expert at the hearing through cross-examination, the expert gave an example of frequent trip to the emergency room. And on cross-examination, the administrative law judge asked the medical expert, would these trips be necessary? And the medical expert hung on the opinion and said, yes, I don't see this as drug-seeking behavior. I do believe that there is an equaling or a meeting of the listing. And then further on cross-examination, and I was the hearing attorney at this hearing, I asked the doctor, it was the last question, given your total review of the record, what would be a reasonable amount of absences potentially that this person would have? And the doctor said Ms. Matichak would miss at least four days of work given his review of the record. Now, as far as I understand the law, it is certainly Ms. Matichak's burden to provide the evidence. But what else did, you're speaking about Dr. Shapiro, correct?  Other than the plaintiff's own assertions, it didn't seem like Dr. Shapiro based that opinion on anything else in the record. Well, we're only given his testimony, but as far as when he was asked by the judge, he gave one example, which was the frequent trips to the emergency room. He also mentioned right before my final question about the potential absences, he said I'd like to write to recover a listing. He said, but honestly, I just don't know how I'm going to be able to put this in more terms than I've already said, which essentially was him saying, and I want to quote this exactly, and this is on 1967 and 1968 of the trial record, I'm not saying there is no problem. I'm simply saying that her problem does not sit within the parameters that classify the listings of the administration. And then he goes on to say in direct quotes, I concur she meets a disability or equals a listing, because otherwise then we have failed collectively from a medical point of view to provide an adequate explanation for this lady's problems. Now, as I said, I do think it's Ms. Matichak's burden to provide proof of her disability, but when a medical expert called by the commissioner comes and testifies and provides favorable testimony about someone's disability, there shouldn't be extra work on the claimant to then have to go and find out in testimony or in the record where that opinion would be more consistent or supported. Now, the judge did ask about necessity, but the judge did not inquire about which ones of these multiple appointments or these four days would be necessary or how long would be a reasonable time. If it wasn't going to be a full day, how long, how many hours are we talking about here? The judge did not inquire. The judge rested her cross-examination. And I don't believe it should be Ms. Matichak's burden to have to provide consistent and supportive testimony. It should be the judge's burden to find consistent and supportive testimony in the record to disregard that opinion on a functional ability of this claim. That brings me to the second harm, and that was that the judge did not allow a full and fair hearing. And a full and fair hearing was not permitted because cross-examination and the opportunity to make a closing statement was not permitted by the judge. And in fact, during cross-examination, not only did the judge disallow questioning— But cross was permitted, right? It was just cut short. Correct. Cross-examination, there was an attempt to start cross-examination. However, as cross-examination got into a topic that this court recognized in Dimit, is an actual area of concern, the occupational network which the Department of Labor publishes and coincidentally now footnotes in the new regulation, 243P, which was not applicable at the time, but just to the point that this court made in Dimit, it is an opportune topic to use on cross-examination. And as this court recently said in the Schmitz v. Colvin decision, questions about the source and methodology have to be asked at the hearing, otherwise you risk waiver unless there's really, I believe the court used, obvious flaws within the VE's testimony. And in this case, the third harm was an obvious flaw because in this testimony, the VE says, well, I use this program called SkillTrain. And in the few questions that were allowed on cross-examination, I asked the vocational expert, okay, how did you use SkillTrain? And the expert said, oh, there's a methodology statement on the internet. You should check it out. I said, I'm familiar with that. That statement lists three different ways you can use the program. And the VE said, well, I use the total distribution method. And as we fleshed out at the hearing, the total distribution method just takes the total number of jobs in each occupational category that the Bureau of Labor puts out. And this court addressed the problem with that specifically in Runger when you don't have any type of matching detail involved. And when that testimony is challenged, which I think you can read from the record, I was clearly trying to lay a record of both developing the cross-examination and then to be able to make my impeachment of the witness. But I was not permitted to do so because the ALJ wanted to get lunch. And I understand time constraints on these judges. But this was a telephone hearing. There could have been an opportunity to have it later in the day. There could have been an opportunity to say, I'm running late for lunch. Please wrap this up. You have five minutes. If you have any possible topics of rebuttal, make your closing examination. I'll give you time in post to hit anything. But there was none of that. But then after the hearing, right, you were allowed to submit in writing some objections to the use of SkillTran and Job Browser Pro application? I wasn't allowed to. I did submit. They were exhibited, but it was based on an incomplete record because I wasn't able to actually develop the testimony that I wanted to use, nor, importantly, ask the hypothetical questions, particularly from the previous administrative decision that were pertinent in this remand hearing as well as from some of the limitations that were from the state agency doctors and a previous psychological assessment as well. So there were meritorious questions that may not have been prevailing on the judge, but because the judge didn't allow a full and fair hearing, all of the rebuttal is based off an incomplete record. So it's sort of like playing poker against somebody, but then you're not allowed to use all 52 cards in your deck and saying it's a fair game, you had your shot. With that, Your Honor, I'd like to reserve my time for rebuttal. Thank you very much. Okay. You're welcome. May it please the Court. Meredith Schacht on behalf of the Commissioner of Social Security. I'll start with the second argument first. The ALJ did not err at Step 5 in this case. Ms. Matichak was permitted ample time. It's true that the ALJ cut off questioning at some point as she had run out of time, but under the circumstances here, as counsel has acknowledged, questions were asked. He asked the source of the testimony. He asked what methodology the vocational expert used, which she answered in reference to a website and in conversation with counsel identifying that she was using this total group approach. There's no question what her methodology was, what her source was. All of that information came out during the hearing. ALJs are subject to time concerns and incredible workloads. So, yes, she did have to cut the hearing short at some point to move on to more hearings, but under the circumstances here, there's no information that was missing. Counsel indicated that when he got to an area of importance, he was cut off, but the area where the ALJ actually cut him off was when he started asking about O-Net. He asked the vocational expert, is O-Net reliable? She said, I sometimes use it. He asked another question, and she said, I haven't used it here. I did not rely on it. It had no part of my testimony here. And then he continued to ask about O-Net, and the ALJ said, let's be clear. You didn't rely on O-Net today, right? It's not relevant to your testimony here today, and the vocational expert confirmed that. So the ALJ here cut off testimony when it started veering towards something that she established was not relevant. It was not erroneous for her to do so under these circumstances. The vocational expert here, sort of more broadly on the Step 5 issues, the vocational expert was well credentialed. She identified common jobs. And the ALJ explained that agency policy and the medical vocational guidelines that are laid out and governing controlling on the ALJ here also indicated that there were jobs available, essentially answered the Step 5 question even regardless of the vocational expert's testimony. So under no circumstances was there harmful error at Step 5 in this case. Similarly, there was no error in considering Dr. Shapiro's testimony. It is clear that Dr. Shapiro thought that the number of appearances or the number of times that Ms. Matochek went to the hospital would preclude her from working. But he could not identify a reason that she had to go to the hospital. The ALJ is obliged to make a finding based on medically determinable impairments. She asked Dr. Shapiro, can you identify a medically determinable impairment that was imposing your opined limitations, and he could not. He identified some minor restrictions based on asthma, and that was the only restriction that he could tie to a medically determinable impairment. So the ALJ explained very well in her decision how she considered Dr. Shapiro's testimony. It actually provided a framework for much of her 24-page decision. She noted a lot of his testimony, and she did actually accept a lot of his testimony that these hospital appearances did not have a medically determinable impairment that explained them. She was not required to do anything more than she did in her decision. Her decision was consistent with the governing regulations. Her residual functional capacity, as I said, was required to be related to a medically determinable impairment, which Dr. Shapiro couldn't provide here. So both the ALJ's assessment of Dr. Shapiro's opinion and her Step 5 conclusion were supported by substantial evidence, so we would ask that you can... Jack, do you have time for a... Can I just ask you one question just to understand something? I know it's not before us. Neither side is raising it, and that is this. Everyone is clear that the limited question before us is whether Ms. Manachek was disabled before she reached the age of 55. When she reached the age of 55, she was either deemed or determined to be disabled. How does that work? So that's actually under those medical vocational guidelines that I referenced and that the ALJ discussed in her decision. They set out essentially a framework that in some circumstances require either a disability finding or a non-disability finding or in some circumstances suggest one or the other. So those rules laid out in Appendix 2 of Section 404... But does it hinge upon one's physical and mental abilities? It's not just that everyone that reaches the age of 55 is disabled. No. So it's set out. They're called the grid rules because there's essentially, I think, four grids, and it's based on exertional ability first. So there's a grid for heavy. You have no exertional limitations, I think. There's a grid for medium exertional work, for light exertional work, or sedentary work. In this case, the governing rules were in that section of the appendix that addresses light exertional work, and then within that it divides based on age and then based on education and then based on prior work history. Okay. I follow you. Thank you. Thank you so much. You're welcome. Mr. Charlock, you've got a little time left if you want to use it. I'll just briefly respond in order to the points that my colleague made. First, at no time during the hearing did the judge ever say that timing was an issue, either at the beginning of the hearing or after the medical expert or at the beginning of cross-examination. The judge did ask five hypothetical questions, and some of those hypothetical questions were outside of the grid. So it's not as if I threw on limitations in ultimate questions that I was pulling out. It was the judge who asked a question, which would then require some cross-examination to deal with if you're not going to rely on the grids. And the judge did go on the record and say, I'm going to rely on the grids when she turns 55. But the judge did not say anything about relying on the grids prior to 55 that could have given me as the counselor a heads-up of where she was leaning. It's her right to do so, and it probably could have given me less of a reason to cross-examine and more of a reason to go to my closing argument and make a rebuttal. But because she didn't do those things, Ms. Matichak was harmed in that result. The government brings up the use of SkillTran and the O-Net. If somebody is using SkillTran, then they're using the O-Net, and that's in SkillTran's own documents. In SkillTran's methodology statement and in their materials, they have the O-Net in the center of their Venn diagram. So my questioning on the expert was going to be, I don't understand if you use the O-Net and you're using SkillTran, there's unclarity there. They're symptomatic with each other, but they depend on each other. So that was a reason to cross. And I also wanted to ask about what the O-Net says the SVP levels are. Because I did let the judge know in my post that the range in those occupational groups are higher than an SVP, too. So where this notation of unskilled work comes from is important, particularly when we're dealing either with some of the mental restrictions that the remand order and that were in previous restrictions and the judge's third hypothetical, or just unskilled work without the transferable skills, which was also material. So that is why the O-Net, other than being part of the source and method, should be an opportunity to be explored upon. The government also mentioned this total group method, but that is not a method or a distribution. That's just taking an entire amount of jobs within an occupational group. No exertional erosions, no skill erosions. And again, this court has pointed out you might be able to do that. For example, it's like the equal distribution method. But there needs to be evidence of why that's reliable. The judge didn't ask that question, and I asked the judge in the beginning of the hearing on 2180 before the hearing to ask that question in this case. Thank you, Your Honors. Thank you. Mr. Tarlock, thanks to you. Ms. Schack, thanks to you. We'll take the appeal under advisement. And that concludes today's arguments. The court will be in recess. Thank you. Thank you.